[PHILADELPHIA, JANUARY 12, 1835.]

{ AMOS TAYLOR'S Executors *against* MARIS.

#### APPEAL.

The holder of a judgment, a lien on land, a portion of which is covered by a subsequent mortgage, does not by releasing a part of the land bound by the judgment, impair his right to be paid out of the remainder, including the portion embraced in the mortgage, unless the mortgagee has distinctly notified him of his mortgage before the release; and cautioned him against doing an act by which the mortgagee's security may be diminished: and the recording the mortgage is not such notice.

THIS was an appeal from the Court of Common Pleas of Bucks County, under the Act of Assembly, relative to the distribution of moneys arising from sheriffs' sales.

It appeared that *Maris,* the defendant, executed a mortgage dated the 9th November, 1832, and recorded the 11th of the same month, to *Amos Taylor,* to secure the payment of sixteen thousand dollars, with interest half-yearly.  A bond with warrant of attorney accompanied the mortgage, on which judgment was entered on the 20th January, 1823, for the penal sum of thirty-two thousand dollars.

On the 21st day of January, 1823, *Maris* executed two mortgages to *Rachel Maris,* guardian, one conditioned for the payment of nine thousand dollars, and embracing a portion of the real estate, covered by the mortgage of *Taylor;* the other for the payment of twenty-one thousand dollars, not including any of the real estate mortgaged to *Taylor.*   Both mortgages were recorded the 22d day of January, 1823, and were accompanied by bonds, but without any warrant of attorney to confess judgment.

On the 28th of April, 1823, *Taylor* released from the lien of his judgment, certain parts of the real estate of the defendant, by the following instrument:—

" Whereas, *Amos Taylor,* on the twentieth day of January, in the present year of our Lord, one thousand eight hundred and twenty-three, did obtain a judgment by virtue of a warrant of attorney, entered upon the docket of the Court of Common Pleas at Doylestown, in and for the County of Bucks, in the State of Pennsylvania,

against *William Maris* of Solebury township, in the said county of Bucks, gentleman, for the sum of thirty-two thousand dollars debt, besides costs of suit, as by the record of the said court appears, which said judgment is a lien upon all and singular, the lands and tenements of him the said *William Maris*, within the said county of Bucks, and the said *Amos Taylor* upon the suggestion, and at the instance and request of the said *William Maris*, is desirous of discharging the property hereinafter expressed, mentioned and discribed, from all lien and obligation from the said judgment arising. Now, know all men, that at the request aforesaid, he the said *Amos Taylor*, for himself, his heirs, executors, and administrators, doth covenant, promise, agree and engage, that he or they shall not, and will not at any time or times hereafter, proceed against by legal process or otherwise, the following described property, to wit : A certain tract of land and mills, containing one hundred and forty-nine acres and thirty-eight perches, which *David Heston* and *Phebe* his wife, conveyed to the said *William Maris*, by deed dated the 1st day of April, 1819, situate, lying and being in Solebury township, in the County of Bucks aforesaid. Also, a certain messuage and tract of land, upon which the said *William Maris* now resides, situate in the said township of Solebury, in the county of Bucks, containing about twenty acres and eighty-seven perches. Also, a lot of land in the same township and county, lying between *Lewis S. Coryell's* lot, and the River road on the north side of Bridge street; containing about ninety-five square perches of land. And also, that one undivided moiety to which the said *William Maris* is entitled of, and in the Union Mills, and lands thereunto belonging; containing about fifteen acres, situate in the township and county aforesaid, together with the appurtenances. And that he, the said *Amos Taylor*, his heirs, executors or administrators, shall not, and will not look to the said described premises, or any part thereof, for the payment of the judgment debt aforesaid, or any part thereof, or the interest accrued or to accrue thereon, or any way disturb, molest, or put to charge, or damage the present, or any future owner or owners, or occupier or occupiers of the said described premises, or any part thereof; for or by reason of the said judgment, or any matter, cause, or thing thence arising or to arise; provided that nothing herein contained, shall affect the said judgment, or its legal validity; so far as respects all other, the lands and tenements of the said *William Maris*, situate in the County of Bucks, aforesaid; which are not herein expressly exonerated therefrom. In witness whereof, the said *Amos Taylor*, hath hereunto set his hand and seal, the twenty-eighth day of April, in the year of our Lord, one thousand eight hundred and twenty-three."

The property mortgaged to *Taylor* at the time of the execution of

(Taylor's Executors *v.* Maris.)

the mortgage, was worth more than sufficient for its payment.    No part of this property covered by *Taylor's* mortgage was included in the release.

Under a *pluries venditioni exponas* to February Term, 1833, on *Taylor's* judgment, property of the defendant was sold by the sheriff to the amount of twenty thousand six hundred and ninety-five dollars, of which sum eleven thousand four hundred and ninety-five dollars were raised from the sale of that part of the property which was covered by Mrs. *Maris's* mortgage for twenty-one thousand dollars.

The sum of eleven thousand four hundred and ninety-five dollars was claimed by Mrs. *Maris* out of the proceeds of the sale.

The following deposition of *Merrick Reeder*, Esq. was taken on behalf of *Rachel R. Maris*, in pursuance of a rule of court, and read on the argument of the case in the court below.

" *Merrick Reeder*, being duly affirmed, doth declare and say, that I am acquainted with the property described in a mortgage given by *William Maris* to *Rachel R. Maris*, for the use of *Thomas R. Maris, Richard Maris, George G. Maris* and *William Maris*, Jr. for the payment of twenty-one thousand dollars, and dated the 21st day of January, 1823, having lived in the immediate neighbourhood of it for more than thirty years, and surveyed the principal part of said property; and that lots No. 1, No. 2, No. 3, and No. 6, and No. 7, as described in the sheriff's advertisement of the sale of *William Maris's* property under an execution issued by the executors of *Amos Taylor*, deceased, and which were sold on the 19th day of January, 1833, by virtue of said execution, for the sum of eleven thousand four hundred and ninety-five dollars, are parts of the same property described in the above mentioned mortgage, all the above mentioned lots being covered by the mortgage aforesaid, and worth at the date of the mortgage in my estimation about fifteen thousand dollars; and the residue of the property covered by the mortgage not sold by the sheriff was probably worth the balance of the mortgage in 1823. I am likewise acquainted with the property described in the mortgage given by *William Maris* to *Amos Taylor*, dated the 9th of November, 1822, for sixteen thousand dollars, which property was worth in my estimation at the time about fifteen thousand dollars. This property I have known for more than thirty years, and have surveyed it more than once within the time; there have been two stone houses built upon the premises in addition to the mansion house and manufacturing establishments, but as to the precise time they were built I am not able to say, but I am inclined to think they have been built since the date of the mortgage. I am well acquainted with a certain property belonging to *William Maris*, situate in Solebury Township, containing about one hundred and

forty-nine acres, on which are a grist mill and a large cotton manufactory. This property was purchased by *William Maris* of *David Heston*, and is generally distinguished by the name of the *Heston* property. This property was mortgaged by *William Maris* in December, 1822, to the New Hope Delaware Bridge Company, to secure payment of twenty thousand dollars. I considered this property to be worth at that time ten thousand dollars over and above the Bridge Company's mortgage aforesaid, or in other words, I considered the *Heston* property to be worth thirty thousand dollars. I am also acquainted with *William Maris's* mansion house property, containing about twenty acres, situate near New Hope, in the township aforesaid, (consisting of several lots of land.) This property in April, 1823, I think was worth seven thousand dollars, and was some years after transferred to the New Hope Delaware Bridge Company, who about three years ago sold it to *Richard Randolph*, for about five thousand dollars, it may be more, it may be less. This sale to *Randolph* I considered at the time it was made, to · be very low, the cheapest bargain that had been sold in the neighbourhood for many years. I am acquainted with a lot of about ninety-five square perches of land, owned by *William Maris*, in the village of New Hope, between a lot belonging to *Lewis S. Coryell* and the river road, and fronting on Bridge street. This lot was worth in April, 1823, about seventeen hundred dollars. I am likewise acquainted with a property called Union Mills, situated on the river Delaware, in the township aforesaid, containing about fifteen acres, owned by *William Maris* and *Lewis S. Coryell.* This property was purchased of *Edward Blackfan* before the mills were built, and in April, 1823, it was worth ten thousand dollars, say for *William Maris's* half, five thousand dollars. This property has since been conveyed to the New Hope Delaware Bridge Company, who have conveyed the same to *Elias Ely,* and others, who are the present possessors. *Lewis S. Coryell's* interest in the said property, was conveyed to the Bridge Company towards the payment of his debts, but as to *William Maris's* interest I cannot say to whom it was first conveyed, but finally it fell into the hands of the Bridge Company.

" The aforesaid properties to wit, the *Heston* property, the mansion house property, the ninety-five perches in New Hope, and the Union Mill property, are all included in the release from *Amos Taylor* to *William Maris,* bearing date the 28th day of April, 1823, which release I have seen this day upon record in the recorder's office of Bucks County. The aggregate value of the property aforesaid in 1823, estimated by me over and above the twenty thousand dollar mortgage to the New Hope Delaware Bridge Company, is twenty-three thousand seven hundred dollars, and in my opinion the same property was worth as much or more in January, 1833, as it was in 1823 when the release was given."

Cross examined by *A. Chapman*, Esq.

" I am inclined to think that the property is worth more now than in 1823, in consequence of some improvements put upon it since that time by *William Maris.* On the *Heston* property an addition to the house has been built, which probably cost from two to three thousand dollars, and a frame tenement house of considerable worth. On the New Hope lot there was lately built a stone house not yet finished, which has already cost about one thousand dollars.

" The Union Mills is probably enhanced in value, in consequence of the Delaware division of the Pennsylvania canal passing near it."

The court below decided that the plaintiffs were entitled to be paid, the amount of the debt, and interest in the execution. From this decision, Mrs. *Maris* appealed, and it was now spoken to by—

*Ross* for the appellant, who referred to the act of 2d April, 1822, giving the defendant in the *sci. fa.* where the mortgagor has released part of the mortgaged premises an additional plea, that the balance claimed is greater than in a just proportion ought to be levied out of the premises. It is a familiar principle of equity, that where land is charged with a burden, each part ought to bear no more than its just proportion of the charge. If part of the land charged be released, the remainder is chargeable only with its rateable proportion of the original debt and interest, according to the relative value at the date of the charge. 1 *Johns. C. R.* 425, *Stevens* v. *Cooper.* 10 *Johns.* 414. 2 *Penn. Rep.* 283, *M'Lanahan* v. *M'Lanahan.* 2 *Binn.* 299, *Guier* v. *Kelly.* 1 *Yeates,* 189, *Morris* v. *Griffith.* 1 *Johns. Ch. R.* 412, *Cheeseborough* v. *Millard.* 9 *Serg. & Rawle,* 309. 1 *Rawle,* 302, 4. 7 *Johns. Ch. Rep.* 14, *St. Andrew's Church* v. *Tomkins.* 2 *Penn. Rep.* 520.

The recording of Mrs. *Maris's* mortgage, was notice to *Taylor.* The recording a mortgage is constructive notice to all the world. *Evans* v. *Jones,* 1 *Yeates,* 172. *Levinz* v. *Will,* 1 *Dall.* 435. *Taylor,* before he released, was bound to go to the record and see whether any subsequent liens were entered.

*Chauncey,* contra.—The true principle is substitution. If the creditor having notice of the claim of the junior creditor, parts with the fund out of which the latter might be paid, an equity arises in favour of the junior creditor. But this notice must be express, and not merely of the existence of the mortgage, but that there is an equity claimed under it. This head of equity arose from marshalling assets in chancery. No case has been produced yet, to show that if the first creditor exonerates the fund which the junior creditor has not, he looses his rights on the rest. Certainly, there can be no such principle without notice. May not the primary creditor deal with it according to his own interest and humanity? He cited the following cases. *Sagitary* v. *Hyde,* 1 *Vern.* 455. 10 *Mod.* 488.

*Ambler,* 615. 8 *Ves.* 388. 4 *Johns. Ch.* 123. 1 *Hopk.* 469. 19 *Johns.* 486. 9 *Serg. & Rawle,* 309.

*Sergeant* on the same side, was stopped by the court:

*Kittera* in reply.

The opinion of the court was delivered by

Sergeant, J.—The right of the holder of a judgment binding real estate, to discharge by covenant or release, a portion of that estate from the lien, preserving it in force against the rest, cannot, as between the creditor and debtor, be disputed. It is no more than an act of common justice, where the remaining property is sufficient to respond to the claim: and he would be thought a harsh creditor, who, under such circumstances should refuse it, when by enabling the debtor to make a clear title to a purchaser, it might materially relieve him. It is in truth no more than perfecting a partial equity already existing, by which, if the debtor sells a portion of land bound by a judgment, the remaining land in the hands of the debtor or his heir or vendee, must first be proceeded against by the judgment creditor, before the land of the prior purchaser can be levied on. Sir *Wm. Harbert's Case,* 3 *Co.* 11. *Nayler* v. *Stanley,* 10 *Serg. & Rawle,* 450. *Culp* v. *Fisher,* 1 *Watts,* 494.

An act, however, which is perfectly innocent and legal in itself, may become improper, if the party has notice that the rights of third persons may be impaired by it. As if such covenantor or releasor is apprised beforehand that a portion of the land is bound by a subsequent mortgage in favour of another person, and that if he discharges a different portion, and reserves his lien against the part bound by such mortgage, thus loading it with a double burden, the claim of the mortgagee will be sacrificed by his priority. It is manifest that it is unfair and inequitable that he should voluntarily do an act producing these consequences. *Sic utere tuo ut alienum non lædas.* Thus in an analogous case: A person may buy a legal title free from all secret trusts: but if he has notice of a trust, though he may have paid his money, equity will make him the trustee for the party beneficially interested.

But it is essential that notice be shown. It is not sufficient to say, that by the release there is a possibility that injury may result to some one. Perhaps there is no exercise of a legal right, from which, by possibility, a loss may not result to others, in particular cases. Whoever buys a legal title, may by possibility do injury by destroying trusts and equities of which he is not apprised. In itself the act is innocent. It becomes otherwise, when the party knows that it will occasion a loss to a third person.

Had the defendant Mrs. *Maris,* given Mr. *Taylor* notice of her mortgage and desired him to retain his lien, or at least so much of

(Taylor's Executors *v.* Maris.)

it as would cover his claim, leaving the premises mortgaged for her use, it would have been his duty to refrain.   But she never did; nor is there the least pretence that he knew of it.   It is insisted that the recording of the mortgage was constructive notice to him; but that cannot be.   A mortgage or judgment is a lien: the recording a mortgage, or docketting a judgment, is notice of that lien to a subsequent purchaser or incumbrancer, and he is bound to search for it.   But what has the holder of a prior lien to do with hunting up subsequent liens?   The task would be endless; and no where more so than here, where liens are various in their nature, multiplied in their number, and scattered in their registry.   What with mortgages, judgments, awards, testatums, transcripts, recognizances, legacies charged on land, mechanics' claims, registered taxes, debts of intestates, &c. &c., there is no end to them; and if a man could not do a legal act, till he hunted up these varieties of liens, traced them through all their bearings, and examined how far he would displace or shake them in the hands of strangers, of whose concerns he is ignorant, the right to act at all would be taken away; and a judgment entered up on a bond and warrant, or otherwise obtained, and binding lands to ten times the debt, must remain unalterable, pressing the debtor down, and tying up all his property from alienation.   It is well settled in equity, that a judgment is not constructive notice.   *Sugden,* in his treatise on *Vendors* says, the docketting of judgments is not of itself notice to a purchaser : for, says Lord Chancellor Talbot, judgments are infinite.   *Sudg. Vend.* 539.   2 *Ch. Cas.* 47.   *Amb.* 154.   1 *Ch. Cas.* 37.   2 *Freem.* 176.   2 *Eq. Cas. Ab.* 682.   And I see no difference in this respect between judgment and other liens.   It was the duty of the defendant if she meant to gain an equity, to notify the plaintiff distinctly of her position, and to caution him not to do an act by which her security would be diminished.

The act of 2d April, 1822, in relation to the releasing of parts of mortgaged premises, has been alluded to in the argument.  This act enables a mortgagee in such case, to sue out a *sci. fa.* to recover his claim against the remaining property, but makes no provision as to the effect of the release, leaving that to be decided by established principles of law and equity.   And according to these, I take it, the effect of such release must depend on the circumstances of the case. If the mortgagee has notice that by such act, he sacrifices the interest of a subsequent lien creditor, he will be bound to withhold his hand, or if he proceeds, will be held responsible for the loss incurred. He may have this knowledge in the very creation of the mortgage. As if two or more severally seised of land, join in a mortgage, they are all *in- æquali jure,* entitled to contribution amongst themselves; and if the mortgagee should release the land of one from the mortgage, leaving the whole sum to be levied of the remaining lands, he would be doing an act of the injustice of which he was fully conu-

(Taylor's Executors *v.* Maris.)

sant. So where the mortgage was originally by one, and a purchaser of part from the mortgagor intervenes, and before releasing, that fact is known to the mortgagee. See Sir *Wm. Harbert's Case.* And this is the principle of the case of *Stevens* v. *Cooper,* 1 *Johns. Ch.* 430 ; where the mortgagee of six lots, released four, after he knew that a third person had become the purchaser of one of the other two : it was held rateably to reduce the power of the mortgagee over the remaining lots, because it deprived the owners of those lots of their right of contribution as against the lots so released.    But in *Cheesebrough* v. *Millard,* in the same book p. 414, the decision was the other way, because the mortgagee who made an arrangement by which a portion of his security was relinquished, and a subsequent judgment creditor was cut out, had no notice.    The language of Chancellor KENT is apposite to the present case.  "If the judgment creditor had given notice to the owner of the first mortgage, before the arrangement and discharge took place, of the equity which he claimed and expected, I might probably have been inclined to have stayed to a certain extent the operation of the second mortgage.  But there is no evidence nor even ground for presumption, that either *Marvin* or *Millard,* the owners of the mortgages, knew of the existence of the judgment, when the arrangement was made and carried into effect. They were not bound to search for the judgment, and the record was no constructive notice to them : and as the rule of substitution rests on the basis of mere equity and benevolence, the creditor who has thus disabled himself from making it is not to be injured thereby, provided he acted without knowledge of the other's rights, and with good faith and good intention, which is all that equity in such case requires. (*Pothier's Traité des Oblig. No.* 520.)  " The other debtors and sureties," to adopt the observations of *Pothier,* " might as well as the creditor, have taken care of the right of hypothecation which he has lost : they might summon him to interrupt at their risk the third purchasers, or to oppose the decrees. It is only in the case in which they may have put the creditor in *default,* that they may complain that he has lost his hypothecation."

The principles of English Chancery are the same.    I shall content myself with citing a single case decided in that court, in which the doctrine was established ; *Griswold* v. *Marshman,* 2 *Ch. Cases,* 170.    There was due to *Marshman* four thousand pounds upon a mortgage made to him of lands.    The mortgagor after the mortgage, acknowledged three judgments, to other persons for other moneys due.    Two of those persons to whom the judgments were given, gave notice to Mr. *Marshman* of their judgments, and desired him to accept of his money that was due upon the mortgage, which they said they were ready to pay him, and desired him to appoint a time when, and they would pay him his money within a fortnight, to the intent that his mortgage being set aside they might take execution on their judgments, but proved not any money actually tendered.

(Taylor's Executors *v.* Maris.)

But afterwards *Marshman* exhibited a bill against the mortgagor and had a decree to foreclose him of redemption : and afterwards took a further absolute conveyance from the mortgagor for a considerable sum of money. And now the two creditors had a decree against *Marshman* to pay them their money, but *Powell* the third creditor had no relief, because he gave no notice in time, of his judgment.

　　　　　　　　　　　　　　　　　Decree affirmed.