## FIRST NAT. BANK OF ROCK SPRINGS, WYO., v. RODER.

(Circuit Court of Appeals, Eighth Circuit. March 24, 1902.)

### No. 1,618.

**1. MARSHALING ASSETS—JUNIOR INCUMBRANCER—RESORT TO FUND NOT COVERED BY SUPERIOR LIEN.**

One who has a lien upon a single fund or property may compel another, who has a superior lien upon the same fund or property and upon another fund or property, to first resort to the fund or property which is not doubly incumbered for the satisfaction of his claim.

**2. SAME—DEMAND BY A JUNIOR INCUMBRANCER.**

A demand or notice by the holder of an inferior lien on one fund or property upon the holder of the superior lien thereon that he preserve and first exhaust his lien upon other funds or property covered thereby, made or given before his lien upon such funds or property is relinquished or lost, is indispensable to the enforcement of the right of the holder of an inferior lien upon property doubly incumbered to compel the holder of the superior lien to preserve or first exhaust that lien upon property covered by it alone.

(Syllabus by the Court.)

Appeal from the Circuit Court of the United States for the District of Wyoming.

N. E. Corthell, for appellant.

W. L. Maginnis, for appellee.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

SANBORN, Circuit Judge. This is a bill in equity by a junior mortgagee against the holder of the first mortgage upon personal property for an accounting of the proceeds of the mortgaged property and the application of the surplus after the payment of the debt secured by the first mortgage to the payment of the debt secured by the second mortgage. The result of the final hearing was a finding that on March 13, 1897, the First National Bank of Rock Springs, Wyo., the senior mortgagee, had received $7,227.23 more than an amount sufficient to pay its debt and its necessary expenses, and that

this sum was applicable to the payment of the debt of the junior mortgagee, Mrs. J. W. Roder. A decree followed that the bank should pay this $7,227.23, interest and costs, to Mrs. Roder. From this decree an appeal has been taken to this court, and the errors assigned relate to the allowance and disallowance of various items in the accounting between the appellant and the appellee. The most convenient and expeditious way of presenting our answers to the questions raised and our reasons for them will be to state the rulings challenged, the facts pertinent to them, and our conclusions, seriatim, and that method will accordingly be pursued.

1. It is assigned as error that the court charged the bank with the proceeds of certain wool which it received in the amounts and at the times following, namely, on May 14, 1895, $4,889; on May 2, 1896, $1,555; on June 24, 1896, $3,000; and on November 9, 1896, $1,204.78. The conclusions which have been reached upon other specifications of error render it unnecessary for us to consider any of the items here challenged except the charge of $4,889 made against the bank as of May 14, 1895, and the discussion upon which we are about to enter will be directed to a consideration of the question whether or not the appellant was lawfully chargeable with that item in this accounting. These are the facts which condition the answer to this question: This $4,889 was the proceeds of wool clipped from the sheep hereinafter mentioned in the spring of 1895. The mortgage to the bank, which was made on April 6, 1895, covered 10,750 sheep and the wool growing and to grow thereon, and it secured the payment of a promissory note of even date for $16,728.58, due one year after its date. The mortgage to Mrs. Roder, which secured the payment of a note for $8,300, due on demand, and which was made on April 8, 1895, covered these sheep, and some horses, household furniture, and other personal property of little value, that was not described in the mortgage to the bank, but it did not cover the wool. Mrs. Roder was an aunt of the mortgagor in these mortgages, Edwin S. Murray, and his mother, Mrs. Ellen J. Murray, was her attorney in fact. Mrs. Roder resided in Philadelphia. Mr. Murray and Mrs. Roder's attorney in fact, his mother, lived together at Rock Springs, in the state of Wyoming. The sheep were in the possession of the mortgagor in Sweet Water county and in adjoining counties in the state of Wyoming, where they remained until November, 1895. In the spring of 1895 the wool was clipped from the sheep, and sold, and its proceeds—this $4,889—were sent to the bank, where they were placed to the credit of the account of the mortgagor, Edwin S. Murray, and he drew them out as he pleased, and applied them in part to the payment of his personal expenses and in part to the payment of the expenses of herding and caring for the sheep. In November and December, 1895, Murray shipped 10,500 of the sheep in the name of the bank to the state of Nebraska, where they were left until the spring of 1896, when they were sold, and their proceeds were sent to the bank, which placed them to the credit of the mortgagor, Murray, in his account with it, and permitted him to draw them out as he chose. On March 13, 1897, Murray still had 7,269 sheep. He then owed the bank about $23,000. Thereupon he

agreed to turn these sheep over to the bank for a credit in his account of $2.25 a head, or for a credit in the aggregate of $16,355.25. The bank took them at this price under this agreement, and credited Murray's account accordingly. It sold 6,209 of the sheep for $2 per head, and this was all they were worth. During all this time Murray kept his account with the bank. That account was credited with the proceeds of the wool and with the proceeds of the sheep. Murray drew out the money to his credit in it to pay his personal expenses, to pay interest on the mortgage debt to Mrs. Roder, and to pay the expenses of herding and feeding the sheep. He drew out $6,151.93 that was not applied in any way to the care, maintenance, or sale of the sheep or the wool. During all this time Mrs. Ellen J. Murray, the attorney in fact of Mrs. Roder, lived with her son, the mortgagor, at Rock Springs, in the state of Wyoming, and from time to time, as they were disposed of, she knew that the sheep and the wool were sold, but neither she nor Mrs. Roder ever notified or required the bank to apply to the payment of its mortgage debt the proceeds of the wool to the end that a larger proportion of the value of the sheep might be applied to the payment of her debt; but the bank was aware of the existence of the second mortgage to Mrs. Roder. In this state of the case the court below charged the bank with this $4,889, the proceeds of the 1895 clip of the wool, on the theory that it held its mortgage on the wool in trust for the junior mortgagee of the sheep, and that it was bound in equity to preserve and exhaust its lien on the wool before it could be permitted to have recourse to the sheep, for the reason that it held a lien on both the wool and the sheep, while the junior mortgagee had a lien upon the sheep only. But does not this ruling carry the equitable principle of marshaling assets beyond its just limits? The bank did not derive this $4,889 from the property mortgaged to Mrs. Roder. It did not appropriate it to its own use. It had not taken possession of the sheep or of the wool under its mortgage, or commenced to foreclose it, when the $4,889 was received, and credited to Murray in his account with it. The junior mortgagee had not demanded that the bank should collect its debt by foreclosure or otherwise, or that it should apply this money to its payment. The bank simply permitted the mortgagor to use the proceeds of this wool to pay his personal expenses and the expenses of caring for the sheep. In other words, it simply neglected to enforce its mortgage upon the clip of wool of 1895, and it did nothing more. How does this neglect charge it with liability to Mrs. Roder for this money? The answer of counsel for appellee is that the bank had a lien upon two classes of property (the wool and the sheep), while Mrs. Roder had a lien upon one (the sheep). But does this fact, without more, impose upon the holder of the senior lien the duty to preserve and exhaust the property that is subject to that lien only before it can have recourse to that covered by both liens? Does it make the holder of the senior mortgage the guardian of the holder of the junior mortgage, relieve the latter from all duty and diligence, and impose upon the former the burden of marshaling and realizing upon the securities for the best interests of the latter without any demand or requirement from the latter that

this shall be done? Does the mere taking of an inferior lien upon a part of the property subject to a superior lien relieve the holder of the former from all action and diligence to protect and enforce it, and impose the duty to do so upon the holder of the latter? Let us see. The rule which counsel for appellee invokes is well stated by Mr. Justice Story in section 633 of his work on Equity Jurisprudence in these words:

"If one party has a lien on or interest in two funds for a debt, and another party has a lien on or interest in one only of the funds for another debt, the latter has a right in equity to compel the former to resort to the other fund in the first instance for satisfaction, if that course is necessary for the satisfaction of the claims of both parties, whenever it will not trench upon the rights or operate to the prejudice of the party entitled to the double fund."

. It will be noticed that under this rule the burden of action and diligence is imposed upon the holder of the second lien, not upon the owner of the first. It gives the former the right in equity to compel the latter to resort first to the fund subject to the single lien. But it does not impose upon him the duty to do so if the former does not exercise this right. Rights in equity do not enforce themselves. Nothing but good faith, conscience, and reasonable diligence can successfully appeal to a court of equity for relief, and, if the holder of an inferior lien upon a doubly incumbered fund intends to insist that the holder of the superior lien shall first resort to the fund subject to that lien alone for its satisfaction, good faith and reasonable diligence require that he shall give notice of his intention, and that he shall point out the course of action which he requires the holder of the first lien to take, before the latter has changed his position and lost his opportunity to pursue it. In McIlvain v. Assurance Co., 93 Pa. 30, Mr. Justice Sterrett well says:

"It is the duty of the latter [holder of a junior incumbrance], if he intends to claim an equity through the prior incumbrance, to give the holder notice, so that he may act with his own understandingly; and, if he fails to do so, the consequences of his neglect must be visited on himself. While the law makes it the duty of every man to so deal with his own as not to injure another unnecessarily, it imposes on the latter a greater obligation to take care of his own property than it does on a stranger to take care of it for him. To hold otherwise would compel the senior incumbrancer to do for the holder of the junior security what in equity and good conscience he ought to do for himself. The doctrine is one of equity jurisprudence, and. not of positive law, and hence, to affect the conscience of the former, he should have actual, and not merely constructive, notice of the equity claimed by the latter."

In Ocobock v. Baker, 52 Neb. 447, 452, 72 N. W. 582, 66 Am. St. Rep. 519, a bank had a lien by judgment upon certain real estate, and Ocobock had a lien by mortgage upon a portion of the same real property. The bank released its lien upon some of the property which was not covered by the mortgage of Ocobock, and proceeded to enforce its judgment against the mortgaged property. The supreme court of Nebraska held that, although the bank had notice of the existence of the mortgage of Ocobock, the latter could not charge it with the receipt of the value of the lots released in payment of its judgment, because Ocobock had not demanded of the

bank that it should first exhaust its lien upon the lands that were not covered by its mortgage before it had released them from the judgment.    It said:

"But neither constructive notice nor actual notice on the part of the bank of the existence of Ocobock's mortgage was alone sufficient to postpone the bank's judgment lien to his mortgage, because the bank, in possession of such notice or knowledge, released certain lands of Baker's from the lien of its judgment.  Ocobock being a subsequent incumbrancer, he was the party that the law required to be vigilant, and the bank was under no obligation to inquire of him as to the amount of his debt, the sufficiency of the security, nor whether he desired it to first exhaust its lien upon lands not covered by its mortgage, or whether he desired it not to release these lands from the lien of its judgment.  Ocobock, by his laches, has forfeited the right to have the court apply to his case the doctrine of subrogation."

The rule on which the claim of the appellee is founded here is nothing but a corollary of the equitable principle of subrogation, of the general principle of equity jurisprudence that the holder of an inferior lien may pay off the superior claim and be subrogated to all the rights of its holder.   One who has a first lien upon two funds or two pieces of property may collect his debt from one or from both of them.   When another procures a second lien upon one of them, the lien of the former is not destroyed or impaired.   The primary right of the latter is to redeem the property from the first lien by paying the debt it secures.   When he does this he becomes substituted in equity for the holder of the first lien, and acquires the right to enforce that lien against both the funds or properties originally incumbered.   In this way the holder of the junior lien may compel the exhaustion of the property covered by the first lien alone to satisfy that claim.   Circuity of action is avoided, and the same result is attained, by permitting the holder of the second lien to compel the holder of the first to exhaust the property covered by that lien only, before he has recourse to that which is doubly incumbered. Thus the rule here invoked sprang up as a corollary to this principle of subrogation.   But in all these proceedings, in the exercise of the right of redemption, of the right of subrogation, and of the right of compelling the exhaustion of the property covered by the first incumbrance only, the burden of diligence is upon the holder of the second lien, and not upon the owner of the first incumbrance, and he must act, or suffer the loss which his silence and inaction induce. The holder of the first lien is not required to accept redemption or to permit subrogation until the holder of the inferior lien pays, or tenders payment of, his debt.   Nor is he required to preserve and exhaust his lien upon the property or fund which it alone covers until the holder of the second lien demands that he shall do so for his protection.   The law provided a sure method by which Mrs. Roder could have availed herself of the lien upon the wool which was held by this bank.   She could have paid its debt, and have been subrogated to its rights.   It provided another way by which she could have secured the benefit of that lien.   She might have demanded of the bank, before it permitted Murray to use the proceeds of this wool, that it should preserve and exhaust its lien upon the wool, and apply all its proceeds to the payment of its claim, before it had recourse

to the sheep to satisfy it. She followed neither course. Her note was due on demand. She could have enforced its collection at any time. . The note of the bank was not due until April 6, 1896. The $4,889 was paid to the bank, and placed to the credit of Murray, on May 14, 1895,—more than eight months before its debt was due. The appellee, when she filed her bill in this case on June 3, 1898, prayed for no part of this money, but limited her demand to an accounting for the proceeds of the sheep, which she alleged were seized by the bank in satisfaction of its mortgage in October, 1895. It was not until some time during the preparation for the hearing of this case, years after Murray had spent the money here in question, that the claim to charge this bank with this $4,889 as her trustee was first presented by the appellee. Meanwhile Murray's debt to the bank had never been paid, and, after crediting him with all the proceeds of the wool and the sheep, he remained indebted to it many thousands of dollars. The appellee rested in silence and supine indifference while Murray clipped the wool from the sheep, placed its proceeds in the bank to the credit of his account, which was already overdrawn, and drew it out to pay his personal expenses and the expenses of caring for the sheep upon which she held her mortgage. She now appeals to this court of equity to charge upon this bank a loss which was not willfully sustained or inflicted by it, but which was the direct result of her own silence and negligence. There is no equity in her claim. There was no diligence in its pursuit, and it cannot be sustained. A demand or notice by the holder of an inferior lien on one fund or property upon the holder of the superior lien thereon that he preserve and first exhaust his lien upon other funds or property covered thereby, made or given before his lien upon such funds or property is relinquished or lost, is indispensable to the enforcement of the right of the holder of an inferior lien upon property doubly incumbered to compel the holder of the superior lien to preserve or first exhaust that lien upon property covered by it alone. Taylor's Ex'rs v. Maris, 5 Rawle, 51, 57; McIlvain v. Assurance Co., 93 Pa. 30; Hart v. Anderson, 198 Pa. 558, 561, 562, 48 Atl. 636; Ross v. Duggan, 5 Colo. 85, 102; Clarke v. Bancroft, 13 Iowa, 320, 327; Gilliam v. McCormack, 85 Tenn. 597, 607, 4 S. W. 521.

In reaching this conclusion the familiar rule that where a mortgagee of numerous lots of land, who knows that they have been conveyed by the mortgagor, at various times subsequent to the execution of the mortgage, to different purchasers, releases those still held by the mortgagor or by the last purchasers, he may be charged by the earlier purchasers with the reception in payment of his debt of an amount equal to the value of the lots thus released, has not been overlooked. Patty v. Pease, 8 Paige, 277, 35 Am. Dec. 683; Stuyvesant v. Hall, 2 Barb. Ch. 151; Skeel v. Spraker, 8 Paige, 195; Brown v. Simons, 44 N. H. 475; Lyman v. Lyman, 32 Vt. 79, 76 Am. Dec. 151; Chase v. Woodbury, 6 Cush. 143; Shannon v. Marselis, 1 N. J. Eq. 413. But this rule has no application to cases involving the marshaling of assets to pay liens upon personal property, because the interests of the grantees of the mortgagor of real

estate are fixed, certain, and apparent from the conveyances, while those of the holders of subsequent liens are uncertain, since their debts may have been paid, or they may have elected to rely upon the personal credit of their debtors, or on other security, and to abandon their liens, and because this rule rests upon the principle that lots of land conveyed by a mortgagor subject to the mortgage are primarily liable for the mortgage debt in the inverse order of alienation,—a principle which has no application to funds or personal property incumbered by numerous liens.

This case is governed by the equitable rules and principles to which we have already adverted. The appellee had the right in equity to compel the appellant to preserve its lien upon the wool, and to apply its proceeds to the payment of its claim. But the burden of exercising that right with due diligence, so that no unnecessary loss should be imposed upon the bank, rested upon her. If she desired to exercise it, it was her duty to inform the bank that she intended to do so, and to demand of it that it should preserve and enforce its lien upon the wool before it released it, or permitted its proceeds to pass beyond its control. She took no such action. The $4,889 received by the bank on May 14, 1895,—eight months before its debt was due,—has been dissipated by the mortgagor. He still owes the bank thousands of dollars. To compel it to pay this $4,889 is to impose upon it an absolute loss, which reasonable diligence on the part of the appellee in demanding its application to the payment of the first lien might have prevented. He who seeks equity must do equity. The appellee cannot be permitted to impose this loss upon the bank, which reasonable diligence on her part would have prevented. The $4,889 should not have been charged against the appellant in this accounting.

2. Between May 6, 1895, and August 29, 1895, $1,516.43 was drawn out of the bank by the mortgagor, Murray, and paid to Mrs. Roder in satisfaction of the interest accruing upon her mortgage debt. The referee and the court refused to allow the bank any credit for this amount of money, although they charged it with all the proceeds of the wool and of the sheep which it received and placed to the credit of Murray in the account from which he drew this money. This was error. This was an accounting between the bank and Mrs. Roder for the proceeds of the wool and the sheep. Since the bank was charged with all those proceeds, it was certainly entitled to a credit of all the moneys which it paid to Mrs. Roder out of these proceeds, whether it paid them directly or by the hand of Murray. The bank must be credited with this $1,516.43.

3. It is assigned as error that the bank was charged in this accounting with $2.25 a head, the price which it agreed with Murray to credit him for 6,209 sheep in March, 1897, when it should have been charged with only he amount it realized from them and the amount which they were actually worth, $2 a head. This specification is well founded. This was not an accounting between Murray and the bank, but between Mrs. Roder and the bank. In this accounting the latter was not chargeable with the amounts which it might have agreed to pay for property in the worthless notes or

accounts of Murray, but only with the actual value of the property which it received. As the evidence is conclusive that 6,209 of these sheep were sold by the bank for $2 per head, and that they were not worth more than that amount, the charge against the bank on their account must be reduced by 25 cents per head on 6,209 sheep, or by $1,552.25.

There are many other items in this account which are challenged, but it is unnecessary to consider them, because those already considered so change the account that there is no longer a balance against the bank. The amount of that balance on March 13, 1897, as found by the court, was $7,227.23. The disallowance of the charge of $4,889 against the bank, the reduction of the charge against it for the sheep by $1,552.25, and the credit to it of the interest paid to Mrs. Roder, $1,516.43, make a change in the state of the account in favor of the bank of $7,957.68, so that it is no longer liable to account to or pay to Mrs. Roder anything on account of the wool or the sheep; and the decree below must be reversed, with directions to the circuit court to enter a decree in favor of the bank and against Mrs. Roder for the dismissal of the bill on the merits and the costs, and it is so ordered.