**FORBES v. HASSETT, Collector of Internal Revenue.**

**Civil Action No. 730.**

District Court, D. Massachusetts.

April 4, 1941.

William D. Turner, of Boston, Mass., for plaintiff.

Edmund J. Brandon, U. S. Atty., and C. Keefe Hurley, Asst. U. S. Atty., both of Boston, Mass., and Ruppert Bingham, Sp. Asst. to Atty. Gen., for defendant.

FORD, District Judge.

This is a suit properly here, to recover an estate tax of $4,029.76 paid by the plaintiff, duly appointed executor of the will of James Murray Forbes.

### Findings of Fact.

James Murray Forbes died April 26, 1937. On July 16, 1938, the plaintiff filed an estate tax return disclosing a tax liability of $155,440.50. Among the personal property listed in the estate returns were 2,250 shares in a corporation called the North Vancouver Land & Improvement Company, Ltd., (hereafter called "Improvement Company"), organized under the laws of British Columbia. The executor listed these shares as having no value. The Commissioner determined $7.46 as the fair value of each share and the total value to be $16,785. He assessed a deficiency tax of $4,029.76, which, together with interest of $339.45, the plaintiff has paid.

The valuation of the stock by the Commissioner was based on the net value of the assets of the Improvement Company alleged to be disclosed in a valuation report made at the instance of the taxpayer covering the assets of the Improvement Company in the City of Vancouver. The report was made as of April 26, 1937, by one Arthur S. Billings, a Canadian valuator.

This Billings report disclosed that the Improvement Company was a close corporation (see Brooks v. Willcuts, 8 Cir., 78 F.2d 270, 273) which had been prosperous prior to the year 1913. It was located in a small town with a population of 8,500. After the World War of 1914, land developments stopped entirely in practically all of Western Canada and the Improvement Company fell upon lean days. It failed to pay any dividends whatsoever since the year 1913. After the decedent's death, the plaintiff forwarded the 2,250 shares to the Canadian tax authorities for transfer. The taxing authorities at that time, in order to determine the valuation of the stock, communicated with one Miss Jennie C. MacHaffie, a resident of Canada, and secretary of the Improvement Company for many years.

Miss MacHaffie made a written statement to the Assessor of Probate and Succession Duties, at Victoria, British Columbia, to the effect that there had been no general transactions in the stock for many years and stated: "The only transaction for value in this Company's shares for a great number of years was the purchase in October, 1937, of one share each by three people for the purpose of qualification as Directors of the Company, at $12.50 per share." Miss MacHaffie, although she thought, as she wrote, it would be extremely difficult to state a fair market value for the shares, stated in her letter to the taxing authorities, "we consider there would be a range in value from a minimum of $10.00 per share to a maximum of $12.50 per share, as at 26th April, 1937." As a result of this communication the Canadian taxing authorities valued each share at $11.25 and assessed a transfer tax amounting to $5,000. It is apparent that Miss MacHaffie arrived at her valuation of the shares from the sale of the three shares to the qualifying directors. This Canadian transfer tax the plaintiff-executor refused to pay after he made unsuccessful attempts to find a market for the stock. He further testified, as an expert with knowledge of stock values because of his long service as

trustee of estates, that the stock had no value.

The Billings valuation report disclosed he valued the improved properties of the Company at $49,145, stating that this valuation "is in my opinion what may be termed a fair valuation or asking price as at April, 1937, under reasonably normal conditions. The price they could have been sold for at that date is an entirely different matter. It should be noted that from 1913 to 1937 conditions here with respect to land values have been steadily getting worse and from 1929 on the situation has been almost hopeless * * *. No one was interested in store property, no matter what the price may have been. If the Company had endeavored to sell their holdings in the Spring of 1937, it is questionable in my mind if they would have realized more than 50% of what I hold should be the reasonable asking price of these properties." Billings placed no value upon the waterfront property owned by the Improvement Company. No market had been found for the latter kind of property for twenty-four years prior to 1937. The report further stated it was the opinion of the valuator that if the Company began liquidation in 1937 and aggressively promoted the sale of their improved holdings they might have realized approximately $25,000 for their land and buildings.

He stated it would take five years to make collections on any real estate the Improvement Company sold and that a fair liquidating cost should not exceed 15%.

The Company's balance sheets for 1936 and 1937 showed, after deducting taxes, repairs, etc., a rental profit from the improved properties of about $3,000.

In addition to the improved land and buildings, the report disclosed that the net quick assets of the Improvement Company amounted to $54,857.45, consisting of $46,-000 in Canadian bonds, $1,857.45 cash in hand and in the bank, and $7,000 in well secured mortgages. The expert valued the bonds and mortgages at par. The Company was without liabilities.

The stock of the Improvement Company is closely held, a resident of London, England, holding 5,816 shares out of a total of 10,710 shares. Four directors managed its affairs in 1937. The stock has never been listed on any exchange or traded through brokers. The facts show that it was the policy of the directors in 1937 to follow their fixed policy of not liquidating. The plaintiff's decedent was, of course, a minority stockholder and in no position to force liquidation.

The Commissioner arrived at his valuation by dividing what he maintained was a "liquidated net worth" by the total shares of stock outstanding. There was no question that the Company had net quick assets in bonds, cash, and mortgages amounting to $54,857.45. The Commissioner contended that the Billings report showed that $25,000 should be added to the net quick assets making a "liquidated net worth" of $79,857.45. This sum he divided by 10,710, the outstanding shares, getting a result of $7.46, which the Commissioner determined was a fair value of each share. The Commissioner failed to make any deduction for the expense of liquidation in determining this value.

Applicable Treasury Regulations will be found in the margin. [1]

---

[1] Treasury Regulations 80 (1937 Ed.): Art. 10 (as amended by T. D. 4902, 1939–1 Cum.Bull. 325, 326). Valuation of property.—(a) General.—The value of every item of property includible in the gross estate is the fair market value thereof at the time of the decedent's death; or, if the executor elects in accordance with the provisions of article 11, it is the fair market value thereof at the date therein prescribed or such value adjusted as therein set forth. The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell. The fair market value of a particular kind of property includible in the gross estate is not to be determined by a forced sale price. Such value is to be determined by ascertaining as a basis the fair market value as of the applicable valuation date of each unit of the property. For example, in the case of shares of stock or bonds, such unit of property is a share or a bond. All relevant facts and elements of value as of the applicable valuation date should be considered in every case.

* * *

(c) Stocks and bonds.—The value of stocks and bonds, within the meaning of the statute, is the fair market value per share or bond on the applicable valuation date.

* * *

If actual sales or bona fide bid and asked prices are not available, then, in the case of corporate or other bonds, the value is to be arrived at by giving con-

### Conclusions.

It is readily apparent there was no market value for the stock and the question remains as to whether or not it had any inherent value as of the date of the assessment.

■ The assessment is presumed to be correct and the plaintiff here has the burden of proving it wrong. Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212; Philip Allen et al. v. Commissioner of Internal Revenue, 1 Cir., February 5, 1941, 117 F.2d 364. It is my opinion the plaintiff has failed in this.

■ Although the Billings report does not present a bright picture of the real estate situation in North Vancouver, yet, discounting the adverse facts, it did place a liquidated value of $25,000 on the improved holdings of the Improvement Company. Hence, this asset underlay the value of the stock and the Commissioner had a right to consider this value in determining the value of the stock.

■ The other assets of the Improvement Company—government bonds and secured mortgages—were worth their par value and were part of the net worth of the Improvement Company, within the meaning of Treasury Regulations 80 (1937 Ed.) Art. 10 c. These quick cash assets also underlay the value of the stock of the Company.

■ There is no established or controlling method for arriving at the value of the stock. Estate of Henry E. Huntington et al. v. Commissioner of Internal Revenue, 36 B.T.A. 698, 715. The Commissioner here based the value of the decedent's stock on a liquidated net worth, which the stock evidently had, and arrived at the decedent's fractional share of the net worth of the corporation. The plaintiff has not sustained the burden of showing this method of valuing the stock to be erroneous. I conclude it was a correct and fair method.

■ However, I believe that inasmuch as the net liquidated value of the assets was used as a basis for valuing the stock, the Commissioner should have allowed a liquidating expense. This, expert Billings fixed at 15 per cent and this expense, amounting to $11,978.62, should have been deducted from the net worth of the corporation, mak-

ing the net value of the 10,710 shares $67,878.83, instead of $79,857.45. Cf. Weber v. Rasquin, 2 Cir., 101 F.2d 62, 64. On this computation, the value of each share would be $6.34, the total value of the decedent's 2,250 shares $14,265.

Judgment will be entered for the plaintiff, with interest according to law, and without costs to either party, in accordance with the above opinion, in an amount to be agreed upon by the parties. In the event of a disagreement, further application may be made to the court.

siderion to the soundness of the security, the interest yield, the date of maturity, and other relevant factors, and, in the case of shares of stock, upon the basis of the company's net worth, earning power, divided-paying capacity, and all other relevant factors having a bearing upon the value of the stock. * * *