**FORBES v. HASSETT, Collector.**

No. 3720.

Circuit Court of Appeals, First Circuit.

Jan. 14, 1942.

William D. Turner, of Boston, Mass. (J. Lindsay Ware, of Boston, Mass., on the brief), for appellant.

S. Dee Hanson, Sp. Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., J. Louis Monarch and A. F. Prescott, Sp. Assts. to Atty. Gen., and Edmund J. Brandon and George F. Garrity, both of Boston, Mass., on the brief), for appellee.

Before MAGRUDER, MAHONEY, and WOODBURY, Circuit Judges.

WOODBURY, Circuit Judge.

The plaintiff's testator died on April 26, 1937, owning 2,250 shares of stock in the North Vancouver Land & Improvement Company, Ltd. (hereinafter called the Company), a corporation organized under the laws of British Columbia. On July 16, 1938, the plaintiff filed an Estate tax return in which he listed the above shares of stock as having no value. The Commissioner, however, considering the net value of the assets of the Company (land and securities), determined $7.46 as the fair value of each share of its stock and accordingly assessed a deficiency tax. This tax, with interest thereon, the plaintiff paid under protest and then brought this action to recover his payment with interest from the date when it was made.

The District Court, 38 F.Supp. 62, 65, on the basis of agreed facts, depositions, and the oral testimony of two experts, concluded that although the Commissioner had used "a correct and fair method" by which to arrive at his valuation of the stock, he had erred in failing to make any allowance for the cost of liquidating the assets of the Company. Therefore, it gave judgment for the plaintiff, but only for the amount by which the tax would be reduced, with interest thereon, had this expense been considered, and the plaintiff appealed.

The Commissioner based his estimate of the value of the stock upon a report of the assets of the Company made at the instance of the plaintiff by one Billings. This report, which is before us as an exhibit, indicates that the Company was organized in 1891, and that it "operated successfully up to 1913 when the collapse of the greatest real estate boom in Canadian history, followed in 1914 by the Great War, made the land sales almost impossible." Since 1913 the Company has paid no dividends, and with the exception of 1936 has operated at a substantial annual loss.

It appears that the Company has nineteen stockholders one of whom owns over half of the shares. The next largest stockholder was the plaintiff's testator. The stock has

never been traded in on the market and "The only transaction for value in this Company's shares for a great number of years was the purchase in October, 1937, of one share each by three people for the purpose of qualification as Directors of the Company, at $12.50 per share." [1]

It also appears from the Billings' report that as of April 26, 1937, the Company's assets consisted of Canadian Government bonds, cash and mortgages of a total par and actual value of $54,857.45, and both improved and unimproved real estate. It had no liabilities.

The unimproved real estate consisted of property on the water front concerning which Billings had this to say: "I can find no way of arriving at the valuation of this property or what the Company might have realized from it, if anything, as at April, 1937." Itemizing the improved property he arrived at a total value for it of $49,145. This valuation he says, in language quoted by the District Court, "is in my opinion what may be termed a fair valuation or asking price as at April, 1937, under reasonably normal conditions. The price they could have been sold for at that date is an entirely different matter. It should be noted that from 1913 to 1937 conditions here with respect to land values have been steadily getting worse and from 1929 on the situation has been almost hopeless * * *. No one was interested in store property, no matter what the price may have been. If the Company had endeavored to sell their holdings in the Spring of 1937, it is questionable in my mind if they would have re-alized more than 50% of what I hold should be the reasonable asking price of these properties."

Consequently Billings reported:

"If the Company had begun liquidation in 1937 and aggressively promoted the sale of their improved holdings, they might have realized approximately $25,000.00 for their land and buildings."

The Commissioner arrived at his valuation of the stock, which he called its "liquidated net worth", by adding the above sum of $25,000 to the value of the bonds, cash and mortgages and then dividing that sum by the total number of shares outstanding. The court below, accepting Billings' estimate that "it would take five years to make collections on any real estate the Improvement Company sold and that a fair liquidating cost should not exceed 15 per cent," reduced the Commissioner's estimate of the value of the assets of the Company by 15 per cent ($11,978.62) so that, dividing the sum thus obtained by the number of shares, he arrived at $6.34 as the value of each share.

The pertinent statutory provisions [2] read as follows:

"The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated * * *.

"(a) To the extent of the interest therein of the decedent at the time of his death."

The material parts of the pertinent Treasury Regulations are quoted in the margin. [3]

---

[1] The above quotation is from a letter of the secretary of the Company to the Assessor of Probate and Succession Duties at Victoria, British Columbia, which the court below quoted in its findings of fact.

[2] Section 302 of the Revenue Act of 1926, 44 Stat. 70, as amended by section 404 of the Revenue Act of 1934, 48 Stat. 754, 26 U.S.C.A.Int.Rev.Acts, page 227.

[3] "Treasury Regulations 80 (1937 Ed.): "Art. 10 (as amended by T.D. 4902, 1939-1 Cum.Bull. 325, 326). *Valuation of property.*—

"(a) *General.*—The value of every item of property includible in the gross estate is the fair market value thereof at the time of the decedent's death; * * * The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell. The fair market value of a particular kind of property includible in the gross estate is not to be determined by a forced sale price. Such value is to be determined by ascertaining as a basis the fair market value as of the applicable valuation date of each unit of the property. For example, in the case of shares of stock or bonds, such unit of property is a share or a bond. All relevant facts and elements of value as of the applicable valuation date should be considered in every case.

* * *

"(c) *Stocks and bonds.*—The value of stocks and bonds, within the meaning of the statute, is the fair market value per share or bond on the applicable valuation date.

* * *

"If actual sales or bona fide bid and asked prices are not available, then, in the case of corporate or other bonds, the value is to be arrived at by giving con-

Neither the government nor the taxpayer contend that there were sufficient sales of the Company's stock to establish the "fair market value thereof at the time of the decedent's death" and both admit that in consequence the Commissioner and the court below properly considered the Company's "net worth". Furthermore, the government admits that the District Court was correct in modifying the Commissioner's valuation by making an allowance for the cost of liquidating the Company's assets and it also admits "that the court below was correct in fixing the value of $6.34 per share * * * for the stock in question."

 The plaintiff contends that both the Commissioner and the court below erred because they failed to follow the requirements of Treasury Regulation No. 80 in that they failed to consider, in addition to the Company's "net worth", its "earning power, dividend-paying capacity, and all other relevant factors having a bearing upon the value of the stock." Undoubtedly the matters enumerated last above are elements to be considered in valuing the stock, (Appeal of Stebbins, 1 B.T.A. 1157; Crowell v. Commissioner, 6 Cir., 62 F.2d 51; Laird v. Commissioner, 3 Cir., 85 F.2d 598), and undoubtedly the District Court and the Commissioner did not consider them, but the question remains whether, as to those elements, the plaintiff has sustained his burden of proof.

 "Unquestionably the burden of proof is on the taxpayer to show that the Commissioner's determination is invalid" (Helvering v. Taylor, 293 U.S. 507, 515, 55 S.Ct. 287, 291, 79 L.Ed. 623), and in appeals from or petitions to review orders of the Board of Tax Appeals this burden is sustained by the taxpayer when he has shown that the Commissioner's determination is arbitrary and erroneous. Helvering v. Taylor, supra; Taylor v. Commissioner, 2 Cir., 70 F.2d 619; Laird v. Commissioner, 3 Cir., 85 F.2d 598; Weber v. Rasquin, 2 Cir., 101 F.2d 62; Guggenheim v. Helvering, 2 Cir., 117 F.2d 469; Mahler v. Commissioner, 2 Cir., 119 F.2d 869. But the case at bar is not such a proceeding; it is one to recover a tax already paid, and in cases of this sort

obiter dicta in the cases cited above and the actual holding in United States v. Anderson, 269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347, and Reinecke v. Spalding, 280 U.S. 227, 50 S.Ct. 96, 74 L.Ed. 385, establish that the taxpayer has a heavier burden of proof, one which he does not sustain by merely showing that the Commissioner was wrong, but which he only sustains when he has gone further and established the essential facts from which a correct determination of his tax liability, if any, can be made.

Concerning this difference in burden of proof the Circuit Court of Appeals for the Second Circuit in Taylor v. Commissioner, supra [70 F.2d 621], said:

"But the reason for this is obvious; a plaintiff, seeking an affirmative judgment measured in dollars, must prove how much is due. His claim is for money paid and he must show that every dollar he recovers is unjustly withheld. So it is not enough merely to prove that the tax as a whole was unlawful; some of the dollars he paid may nevertheless have been due. But this reasoning does not apply when the proceeding is to review an assessment. Although that does indeed partake of the nature of a judgment, and the taxpayer has the burden of proving that it was wrong, after he has done so, he need not, at least under ordinary principles of procedure, prove that he owed no tax, or what was the tax that he did owe. The original assessment rested upon a finding, presumptively correct, but the presumption of its correctness does not extend to other findings which the Commissioner has never made. Any other result would invert the ordinary rules of procedure by imposing a burden of establishing a negative upon the obligor; indeed of disproving the existence of all possible obligations." [4]

The taxpayer, however, contends that he has sustained this heavier burden of proof by showing that in April, 1937, the Company's stock was in reality worthless. His argument is that considering the Company's substantial annual deficits and the fixed policy of its directors not to liquidate, it was only a matter of time before the assets of the Company would be entirely consumed

sideration to the soundness of the security, the interest yield, the date of maturity, and other relevant factors, and, in the case of shares of stock upon the basis of the company's net worth, earning power, dividend-paying capacity, and all

other relevant factors having a bearing upon the value of the stock."

[4] This language was referred to with approval by the Supreme Court of the United States in Helvering v. Taylor, 293 U.S. 507, 514, 55 S.Ct. 287, 79 L. Ed. 623.

and that no way of escape from the ultimate consequences of this situation to him as a stockholder was open. He says that being a minority stockholder he could not force a liquidation, and that he could not sell his stock because there was no market for it even in small blocks, to say nothing of large ones. We cannot agree.

On the critical date the Company had actual tangible assets, approximately two-thirds of which were liquid, and the plaintiff admits that "The stock in this company had a very substantial value prior to 1913, and at some time in the next twenty-five years it is possible that it may have value again." Obviously this is so. The directors might at any time change their policy, and even if they did not, their policy of holding on might be vindicated by a rise in land values. This possibility of future value made the stock worth something to someone. Possibly only a speculator would buy it and then only for a small price, but it had value and consequently the Commissioner was correct in so far as he assigned some value to it. Having done so, and the taxpayer having elected to pay the tax assessed on that value and to bring suit to recover his payment, he assumed the burden of proving the facts from which the amount of the tax which he actually owed could be ascertained.

If, because of the Company's lack of earning power and dividend-paying capacity, and because of its generally dubious prospects, the value of each share of its stock ought to be reduced below the value of the fractional part of the Company's assets which each share represented, it was the plaintiff's burden to offer evidence to show how much this reduction ought to be. This he failed to do. All he has shown in reduction of the value of the stock is the actual cost of liquidation and the time (about five years) that it would take to liquidate. The first of these elements the District Court properly considered in rendering its judgment. It erred in not considering the second one. If liquidating value is taken and the cost of liquidation is properly considered, the time required for liquidation should also be taken into account in order to arrive at the value of the assets underlying the Company's stock upon the critical date. The ultimate liquidating value should be discounted over the appropriate period of years at what the court may fix as the proper rate.

The taxpayer further contends that the transfer tax of $5,000 imposed by the Canadian government should also be taken into account for the reason that it must be paid before the executor can give title to the shares. We consider this contention to be lacking in merit because the statute expressly provides that the value of the gross estate shall be determined to the extent of the interest therein of the decedent, and his interest was not dependent upon the payment of the tax in question.

The judgment of the District Court is reversed, and the case is remanded to that Court for further proceedings in conformity with this opinion.