**J. C. CORNILLIE CO., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. No. 25676.

United States District Court
E. D. Michigan, S. D.

Nov. 7, 1968.

J. Bruce Donaldson and David P. Ruwart, Raymond, Chirco, Fletcher, Donaldson & Ruwart, Detroit, Mich., for plaintiff.

Arthur L. Stern, III, U. S. Dept. of Justice, Washington, D. C., for defendant.

## OPINION

TALBOT SMITH, District Judge.

This action is a suit for refund by plaintiff, J. C. Cornillie Company, against the United States of America, to recover income tax in the amount of $15,600.00 plus statutory interest which was assessed against it for the fiscal years ending March 31, 1960 and 1961. (Stip. ¶ 2) It is a case requiring much analysis in detail since the problem is one of differentiating form from substance. It stems, as we later point out, from a change in the economics of, and practices involved in, the heating of homes.

The Court has jurisdiction and venue in this action for refund of internal revenue taxes under §§ 1346(a) (1) and 1402(a) (2), Title 28 of the United States Code. Stip. ¶ 2.

Within the time prescribed by law, plaintiff filed its corporate income tax returns covering the fiscal years ending March 31, 1960 and 1961 (Exs. 8, 9 [1]; Stip. ¶ 13) but in computing the tax owed, plaintiff claimed a deduction in the amount of $15,000.00 for each year. This represented the amount which it determined to be due to Gulf Oil Corporation under a contract between plaintiff and Gulf. (Exhibit 1). The amount of the tax so computed was timely paid. Stip. ¶ 13

As a result of examination of plaintiff's income tax returns for the years 1960 and 1961, a deficiency notice (Exhibit 10) was sent to plaintiff which asserted a deficiency of $10,106.66 for the fiscal year ended March 31, 1960 and a deficiency of $6,356.80 for the fiscal year ended March 31, 1961. A part of the 1960 deficiency, and all of the 1961 deficiency, represented the disallowance of the claimed deduction of $15,000.00 for each year. Stip. ¶ 14

Plaintiff paid the additional tax demanded for 1960 and 1961 on November 11, 1963. (Stip. ¶ 15) Later, in December, 1963, pursuant to §§ 6511 and 6532 of the Internal Revenue Code of 1954, and within the period allowed by law, plaintiff filed two claims for refund (Exhibits 11 and 12).[2] Both claims were disallowed in August, 1964, by the District Director. (Stip. ¶ 16) These are the claims before us.

The parties have stipulated that if it is determined that plaintiff is entitled to recover any amount from the defendant, the parties will jointly compute said amount to be submitted by the Court for approval, but that in the absence of said agreement, the amount will be determined, upon hearing, by the Court, and further that until such amount has been approved or determined by the Court, no final judgment shall be deemed to have been entered in this action. Stip. ¶ 17

It is the plaintiff's claim that during its fiscal years 1960 and 1961, it incurred expenses under a contract between Gulf Oil Corporation and itself in the nature of "referral commissions". These were based upon the amount of fuel oil delivered by it to certain customers of Gulf Oil Corporation. Such expenses are deductible as ordinary and necessary business expenses within the purview of Section 162 of the Internal Revenue Code.

In the event the amounts are required to be capitalized, as defendant claims, pursuant to Section 263 of the Internal

---

[1]. Defendant does not admit the truth or accuracy of statements or computations contained in Exhibits 8 or 9, except as specifically admitted elsewhere in the stipulations between the parties. Stip. ¶ 13.

[2]. Defendant does not admit the truth or accuracy of statements or computations contained in Exhibits 11 and 12 except as specifically admitted elsewhere in the stipulations between the parties. Stip. ¶ 16

Revenue Code, the plaintiff alternatively contends that it is entitled to amortize the amounts over the period of the expected useful life. Pre-Trial Order ¶ 1

The defendant on the other hand, argues that liabilities accrued and payments made to Gulf Oil Corporation in the fiscal years ending March 31, 1961, in the amount of $15,000.00 for each year, were for customers' names and addresses transferred to J. C. Cornillie Company by Gulf pursuant to a contract of April 22, 1959, and as such, are not deductible as expenses under Section 162, Internal Revenue Code of 1954. They are, rather, required to be capitalized pursuant to Section 263, IRC of 1954, being the cost of a portion of the business Gulf developed—i. e. the cost of an intangible asset in the nature of good will.

Defendant further contends that the 1954 Internal Revenue Code does not permit the depreciation or amortization of good will. Pre-Trial Order ¶ 2

Thus are we presented with the issue of whether the payments made by J. C. Cornillie to Gulf Oil Corporation during the fiscal years March 31, 1959 and March 31, 1960, are "commissions" deductible as ordinary and necessary business expenses within the purview of Section 162, Internal Revenue Code of 1954, or whether they should be capitalized, pursuant to Section 263 of the Code; further, if required to be so capitalized, whether such amounts are entitled to amortization under Section 167 of the Code.

## FINDINGS OF FACT

The background of this controversy involves a pronounced change in the economics of, primarily, house heating. Plaintiff, J. C. Cornillie Company, (hereinafter at times referred to as Cornillie) founded in 1904, was incorporated in 1947, and has been continuously engaged since its founding in the business of selling various heating fuels to residential customers in the greater Detroit area. Stip ¶¶ 1, 3

Gulf Oil Company (Gulf) is engaged in the business of extraction, refining and marketing of petroleum and various other related products throughout the United States. Stip ¶ 4

In the late 1950's the fuel oil market in the Detroit area was diminishing. Those in the industry recognized that the widely advertised advantages in cost, clean heat and general efficiency offered by gas heat would result in a continuing change-over to that fuel. As anticipated, (1) a significant number of change-overs from oil to gas burning furnaces took place in existing residences; and, (2) as to new construction, almost all were gas installations, a few electric, and none oil (except where gas was unavailable). R. 15–17, 131, 202

The competitive inroads of gas had, in the Detroit market, been somewhat inhibited in the late 1940's and early 1950's by lack of adequate gas supply. During this period, gas was available only on a long waiting-list basis. By the late 1950's a new interstate pipeline installation substantially increased the supply of natural gas. The expansion in natural gas availability, taken together with a long waiting list of change-over requests, further imperiled the market for fuel oil in the late 1950's. R. 15–17, 131, 202

Late in 1958 Gulf determined to alter its fuel oil marketing program in the Detroit area. (R. 119–20, 123, 128–9.) Previously, Gulf had marketed its fuel oil directly to the consumer. R. 117–120

In order to expand its volume of fuel oil sales and capture a greater share of the market, Gulf adopted a new marketing strategy, namely, to expand sales through switching independent jobber-distributors from competitive fuel oil brands to Gulf. With each switch, Gulf's sales expanded by the total existing gallonage of the independent distributor. (R. 119–20, 123–4, 128–9) The tactic adopted by Gulf to induce the independent's brand-switch involved a shift by Gulf of its direct residential deliveries

to the independent distributor, thus substantially expanding the independent's retail sales volume, simultaneously requiring entry into an exclusive distributor contract. (R. 119–20, 123, 128–9) However, Gulf continued to maintain terminal distribution facilities and continued direct delivery to commercial customers in company-owned fuel trucks in the Detroit area as well as direct distributions to residential users in areas adjacent to Detroit. R. 177–8

There was no evidence that Gulf planned to re-enter this market. As Mr. Bernard Cornillie testified, the fuel oil business was a dying one. (Tr. 15–17) He described Gulf's residential customer accounts as a "dead horse", due to the increasing invasion of gas into the fuel oil market. (Tr. 93, 152) Apparently, Gulf felt it most advantageous to transfer these accounts to dealers, who would agree to supply Gulf oil to their current customers, as well as the customers turned over by Gulf, thereby increasing the sale of Gulf fuel oil during the remainder of the life of the fuel oil business.

Gulf did not, in fact, re-enter this market. Since June 1, 1959, up to and including the present time, Gulf Oil has not serviced the customers whose names and addresses were delivered to J. C. Cornillie Company pursuant to its contract of April 22, 1959 with Gulf Oil Corporation. (Exhibit 1, Stip. ¶ 10) Nor has Gulf Oil sold or delivered fuel oil directly to residential homes in the Detroit area. Stip. ¶ 11

## THE CONTRACT NEGOTIATIONS

Gulf's District Manager, Boydon Jann, was designated to implement the marketing change in the Detroit area. After surveying the independent fuel oil jobbers within the Detroit area, gathering information concerning existing gallonage, available facilities, marketing area, and related matters, a series of direct contacts was initiated by Gulf. (R. 120–6) The companies contacted were all engaged in the business of selling heating fuel oil as independent jobber distributors to residential customers in the Detroit area and included Holden Fuel Oil Co., Inc., D & W Oil Company, Austin Oil Corporation, Cadillac Fuel Company, Eastern Oil Company and Cornillie. R. 122, Supp. Stip. ¶ 1

A series of meetings followed between Gulf and Cornillie. After general discussion concerning the change in Gulf's marketing policy, Gulf offered to sell the customer accounts for three cents, multiplied by annual gallonage represented, payable over a period of six years. (R. 19–20, 21–2, 67–9, 102, 206–8) This offer was flatly refused. (R. 21–2, 67–9, 102, 206–8, 214, 219–20) Cornillie's refusal was so adamant that Mr. Jann thought "we could never get together". R. 132–3, 229.[3]

Gulf next approached Cornillie in February, 1959. Gulf had concluded that Cornillie offered substantial advantages over other jobbers in the area (R. 124, 130–1) and that it would bring with it large present fuel oil requirements, which it was then purchasing from a competitive brand. (Stip. ¶ 12) As a result, Gulf approached Cornillie with a view to offering whatever it would take for Cornillie to do business with Gulf. R. 23, 229.

Cornillie took the position that although it would not purchase the customer accounts because of the expected attrition, it would agree to become a Gulf distributor, and further, would pay a commission of one-half cent per gallon, based upon actual gallonage delivered, for customers referred by Gulf. (R. 23, 34, 136–7, 224) This proposal was agreed to and a form contract was sub-

---

3. Cornillie's refusal was allegedly based on the fact that because of the inroads of gas, fuel oil represented a dying market, and that the attrition would be expected to accelerate rapidly as the supply of gas expanded, particularly since customer loss through occupancy turn over was higher than average in the area. (R. 21–2, 131–2, 206–8, 214, 231–2). The conference ended on the notes that Cornillie had no interest "in purchasing a dead horse." R. 131

mitted to Cornillie's attorneys to be redrafted to reflect the mutual understanding as orally agreed upon, that the transaction was to be a commission agreement and not a purchase.[4] R. 23, 34, 136-7, 224-5

It is plaintiff's position that the commission arrangement was arrived at due to the following business factors:

"a) The addition of the Gulf gallonage to the already existing Cornillie business in its service area, would permit economies through concentration in deliveries and thus reduce the overall delivery cost per gallon. This resulted in higher gross profit margin on sales and increased total profit.[5] R. 58-60 "b) The substantial improvement in profit margin justified, from a business standpoint, a related expense of $\frac{1}{2}$ cent per gallon commission to Gulf for referral of the sale. R. 60

"c) Whereas, the Gulf proposal of purchase resulted in a capital expenditure projected at $90,000.00, the "commission" counter-proposal was expressly geared to, and payable only on, actual gallons delivered. R. 23, 58, 60, 206-8 [6]

"d) From an accounting standpoint, commissions constituted an expense which could be currently subtracted from the related sale to give a true reflection of actual profit. In a purchase, the cost would be capitalized, which would result in the balance sheet reflecting a capital asset—customer accounts $90,000.00—which due to the

4. Mr. Cornillie testified that he reached an oral mutual understanding with Gulf and a firm agreement on the commission arrangement before consulting with his attorney. (R. 72-3, 209) He also testified that although the income tax consequences were considered as one of the factors in the business decision, it was not the sole or principal reason for its counter proposal. R. 100, 102, 60

5. "In fact, the transaction increased the profit margin on sales from 4-7 per cent and increased the pre-tax profit from $39,-000.00 in 1959 to $105,000.00 in 1960, approximately." R. 58-60. Brief for Plaintiff, p. 9

"dead horse" aspect, would grossly distort the accounting records. R. 92-3 "e) From a tax standpoint, commissions constituted deductible expenses thus matching the taxable sale with a related deductible expense. (R. 60-1) In a purchase, the cost would be capitalized, thus increasing the net asset base upon which state corporate franchise tax is computed, resulting in a permanent increase in annual franchise tax, on a "dead horse" asset the entire value of which had expired. R. 92-3, 196." Brief for Plaintiff, pp. 9-10.

THE CONTRACTS

Pursuant to its plan, Gulf entered into contracts, in the spring of 1959, with six jobbers in the Detroit metropolitan area including Cornillie. (Stips. Exs. 1, 2, 5, 6, Supp.Stip. Exs. A, B, C, D, and I; Tr. 160). There were actually two contracts entered into with each jobber. One was a standard dealer contract, calling for the purchase by the dealer from Gulf of fuel oil at regular scheduled applicable prices, and the agreement of Gulf to supply fuel oil to the dealer up to certain specified maximums. The second contract with each dealer was for the assumption, by that dealer, of Gulf's market in a geographical area of metropolitan Detroit for the delivery of fuel oil to homeowners. Each dealer was to make payments to Gulf over a period of six years, from June 1, 1959, to May 31, 1965, on the basis of gallonage delivered to transferred customers during the specified portions of the six-year period.[7]

6. See Record, pages 67, 68, 102, 207, 209-10, 219, 222-3, regarding Bernard Cornillie's original understanding of the "purchase" proposal. See, also, Record, 75, 102, 207-9, 221, 222.

7. The terms of payment for the names and addresses in all contracts were similar except that the payments made during the last three years were calculated on a slightly different basis in the Cornillie contract although all were tied in with the amount of fuel oil sold to transferred customers.

After the six-year period was over, *none* of the dealers was required to make any further payments for his continuing market.

Immediately prior to the execution of each of the agreements [8] Gulf Oil had been selling fuel oil directly to each of the customers whose names and addresses were delivered to Austin Oil Corporation, Cadillac Fuel Company, Holden Fuel Oil Co., Inc., D & W Oil Company, and Cornillie, pursuant to the respective agreements. Gulf ceased such service by June 1, 1959. Supp.Stip. ¶ 2–3

In conjunction with the discontinuance of service by Gulf, identical letters were prepared by Gulf and mailed on or about May 15, 1959, to the customers whose names and addresses had been delivered to the various distributors under the contracts. Ex. 7; Stip. ¶ 8; Ex. E–H; Supp.Stip. ¶¶ 4–7

All of the letters described the change-over process to the customer and introduced them to the new distributor chosen "after carefully considering all factors involved, the most important one being SERVICE to you. Their (number of years experience, depending upon the distributor involved) qualifies them to render complete and satisfactory service to their customers, * * *" The letters all express confidence in the new dealer and assure the customer that they can look forward to prompt and efficient service. The letters conclude:

"May we express our appreciation for your patronage over these many years, and we are confident that * * * Company will serve you in a manner that will assure you of a continuation of the high esteem we in Gulf have for you—our customer."

## THE CORNILLIE CONTRACT

The Cornillie contract, the last to be signed, differed in terminology from the other dealer contracts, in that while the other contracts spoke in terms of purchase and sale of customer accounts, the Cornillie contract did not use those terms.

The Cornillie-Gulf contract stated:

You agree to serve and deliver said Gulf Solar Heat Fuel Oil to our customer accounts in your above described territory. Said customers' names and addresses will be referred to you on or about June 1, 1959. In consideration thereof you are to pay a commission to us on each gallon of Gulf Solar Fuel Oil delivered by you in the manner hereinafter provided.

The contracts with the other jobbers stated that:

We [Gulf] agree to sell and transfer to you, and you agree to purchase, accept, serve and pay for the Gulf Solar Heat Fuel Oil customer accounts in your above territory according to a list which we [Gulf] agree to deliver to you on or about June 1, 1959.

It is apparent that Cornillie intended to achieve a certain legal effect through the use of this language composed by its attorney, i. e. to be able to treat its payments for the customer lists as expenses deductible from ordinary income for tax purposes in the year incurred as "commissions".

In fact, it is plaintiff's position that it was the understanding of both parties to the contract that, based upon the negotiations and language of the contract:

a. the amounts paid were in substance "commissions" for the referral of current business, and not for the

---

8. Exhibit A. An agreement dated Feb. 18, 1959 between Gulf Oil Corp., and Holden Fuel Oil Co., Inc., Royal Oak, Michigan
Exhibit B. An agreement dated Feb. 26, 1959 between Gulf Oil Corp., and D & W Oil Company, Detroit

Exhibit C. An agreement dated March 20, 1959 between Gulf Oil Corp., and Austin Oil Corp., Detroit
Exhibit D. An agreement dated April 3, 1959 between Gulf Oil Corp., and Cadillac Fuel Company, Detroit. Supp.Stip. ¶ 1a,–d

acquisition of any property rights in the customer accounts or lists;

b. the customer lists were placed in the possession of Cornillie to facilitate the referral of customer's current business; at all times Gulf continued to own these lists;

c. the customer lists were to be returned to Gulf at the conclusion of the contract;

d. upon completion of the six year contract, Gulf had the right to recommence servicing these customer accounts, or to transfer the customer lists to another jobber-distributor.

Cornillie argues that it was clear to Gulf, and the plaintiff, that the customer relationship and the records, as provided by the language "our" in the contract, continued at all times to be the property of Gulf during the term of the contract. (Jann Dep., Oct. 10, 1966, p. 19) But in no real sense was there any "property" interest in Gulf. No feature of the concept of property was retained by Gulf. Cornillie was in the process of building up good will among its new customers. In the letter to the customer sent by Gulf there is no indication that the change in distributors is to be a temporary arrangement and, in fact, Gulf does what it can in the letter to present the new distributor in the best possible light to instill customer confidence in it.

Although Cornillie maintains that it was going to return and did return the customer lists at the end of the contract, clearly it had no intention of returning the customers that went with that list. The fact that Cornillie testified that the company had no intention of discontinuing service to the customers on the referral list indicates to this Court that the distinction sought to be drawn by plaintiff between "commission" and "sale" is extremely thin, if, indeed, existent.

The parties may well have agreed to call their arrangement a "commission" rather than a sale. This seems quite clear. However, this Court must determine just what it was that Cornillie received from Gulf, regardless of what it was called by the parties.

The fact that Cornillie wrote to Gulf on December 8, 1964 and April 21, 1965 that it would be returning the "Gulf Solar Heat customer accounts" (Exhibits 15, 16) at the end of the contract term is of little persuasive value in the light of the fact that although it returned the "paper" accounts in June, 1965, Cornillie had no intention of returning their substance, i. e., the customer relationships themselves, but planned to continue to service these accounts.

Plaintiff argues that the continued service and the continuing relationship with Gulf results from the fact that the market is declining and Gulf chose not to exercise its right to service these customers rather than lose the four million gallon oil account with Cornillie. (Tr. 51, 64, 98–9) But Mr. Cornillie testified that at no time did they consider ending service with the Gulf accounts. (Tr. 88–90, dep. of Jan. 5, 1967, p. 77. See, also, Tr. 197–8; B. Cornillie dep. 77). This Court cannot accept the conclusion that Mr. Cornillie was simply anticipating the position that Gulf Oil would take.

Plaintiff claims that there was no sale or transfer, by Gulf to Cornillie, of any asset of any kind whatsoever, including good will. Cornillie did receive, it is clear, exclusive use and control of the customer lists and under the facts before this Court, it appears without doubt that Gulf transferred not only this exclusive use and control but "good will" as well, regardless of what the parties chose to call it.

The payment arrangement in the final contract was essentially the same as in the contracts between Gulf and the other dealers although the contract spoke of "purchase" of accounts. There is little question that all along Mr. Jann proposed a contract similar to that accepted by the other dealers (Jann, Tr. 231) and the deal that was finally accepted—although phrased in slightly different terms—had the same legal effect. The payments made by Cornillie under the

contract, for the good will transferred to it, were as large as the payments to be made under the contracts with the other dealers. (Cornillie, Tr. 195–196, 199–200; Jann, Tr. 234) As far as Mr. Jann was concerned, the original contract offered to Cornillie and refused, and the agreement finally entered into, were the "same deal." (Tr. 234) (See, also, Cornillie, Tr. 196, 225) Mr. Cornillie, on the other hand, was unable to say which contract had more economic value. Tr. 102.

We find that pursuant to its contract with each dealer, including Cornillie, Gulf good will in the market was transferred to the dealer, regardless of the terminology employed by the parties.

Gulf not only turned over to each dealer the names and addresses of the current customers in the market assumed by the dealer, and other data to facilitate the servicing of these customers, such as credit and delivery information and addressograph plates for billing (Tr. 57–58), but Gulf also wrote to all of the homeowners in the market being assumed, urging those home owners to patronize their new supplier from that time forward. Stip. ¶ 8, Ex. 7; Supp.Stip. ¶ 4 (Ex. E), ¶ 5 (Ex. F), ¶ 6 (Ex. G), and ¶ 7 (Ex. H)

At the time of the trial of this case (February, 1967), the number of the accounts held by Cornillie had dropped to somewhat over 1,000 from the original 3,000. (Tr. 65) Although this attrition rate is higher than normal because of the nature of the market involved, the Court is not convinced that this reason alone supports Cornillie's argument that although Gulf had every right to re-establish the customer relationship with these accounts (or to transfer it to someone else) it did not for this reason exercise it. Gulf Oil has never made any attempts to re-establish a market itself since June 1, 1959 (Stip. ¶¶ 9–11) nor does it appear that either Gulf or Cornillie expected that such attempts would be made. Gulf clearly considered its relationship with Cornillie under this contract the same as the agreement made

with the other dealers. The customer lists were sold, good will was transferred and Gulf did not intend to retain any rights in the customers involved. The Cornillie deal may look different on paper and it was so intended; however, it is clear under the facts before this Court that there is no essential difference between the arrangement made with Cornillie and that made by Gulf with any of the other oil dealers, regardless of the wording employed. Once the original purchase price was paid, Cornillie has not been required to make any further payments under the contract. Cornillie continues to service a portion of the customer accounts and pays Gulf only regular fuel oil prices. Cornillie has the accounts, makes no further "commission" payments now that the purchase price has been paid, and Gulf has the paper. It is the Court's conclusion that these accounts were meant to be transferred, and were transferred, to Cornillie by Gulf, just as the other customer accounts were transferred, such as that to Holden Oil Co. and the other fuel oil dealers here involved.

## CONCLUSIONS OF LAW

The burden of proof in a tax refund suit is on the taxpayer to prove all the factual elements necessary to a determination that the correct tax liability of the taxpayer is not accurately reflected by the assessment—and, to prove, further what that correct tax liability is. Reinecke v. Spalding, 280 U.S. 227, 50 S.Ct. 96, 74 L.Ed. 385 (1930); United States v. Anderson, 269 U.S. 422, 46 S. Ct. 131, 70 L.Ed. 347 (1926); Compton v. United States, 334 F.2d 212 (4th Cir. 1964); Forbes v. Hassett, 124 F.2d 925 (1st Cir. 1942).

In this case the plaintiff must therefore prove (1) that the alleged payments were made; and (2) that they are not the kind of payments deductible from gross income.

There is no doubt that (1) the alleged payments were made.

There is argument, however, as to the character of such payments.

STATUTES AND REGULATIONS INVOLVED.

Internal Revenue Code of 1954:

Sec. 162. TRADE OR BUSINESS EXPENSES:

(a) *In General.*—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. * * *

* * * * * *

(26 U.S.C. 1964 ed., Sec. 162)

SEC. 263. CAPITAL EXPENDITURES.

(a) *General Rule.*—No deduction shall be allowed for—

(1) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate. * * *

* * * * * *

(26 U.S.C. 1964 ed., Sec. 263)

Treasury Regulations on Income Tax (1954 Code):

SEC. 1.167(a)–3. *Intangibles.*

If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill. For rules with respect to organizational expenditures, see section 248 and the regulations thereunder. For rules with respect to trademark and trade name expendi-tures, see section 177 and the regulations thereunder.

(26 C.F.R., Sec. 1.167(a)–3)

SEC. 1.263(a)–2. *Examples of capital expenditures.*

The following paragraphs of this section include examples of capital expenditures:

* * * * * *

(h) The cost of good will in connection with the acquisition of the assets of a going concern is a capital expenditure.

(26 C.F.R., Sec. 1.263(a)–2)

The Internal Revenue Code of 1954 differentiates between "ordinary and. necessary business expenses," deductible by a business in the year incurred (Section 162, *supra*), and capital expenditures of a business, which are not so deductible (Section 263, *supra*). The law is clear that payments for intangibles assets, such as names and addresses of customers, (more broadly phrased as payments for good will, since what is being transferred is business that the transferor has built up), are capital expenditures and not deductible as ordinary and necessary expenses.

Plaintiff claims, however, that it did not pay for the transfer of the customer lists, that it never, in fact, owned the lists but merely paid a commission for the use of said lists. Plaintiff further argues that since no asset was transferred to it by Gulf, there could be no transfer of good will.

Plaintiff offers the clear language of its contract with Gulf to support its contentions.

The right to a deduction is to be determined by the true character of the expense paid or incurred. Although book entries and labels attached to the transaction are of course important as indicating how the expense was treated by the taxpayer or others, in themselves they neither justify an allowance nor a disallowance of the deduction provided for in the Code. Mertens, 4A, § 25.13. Clearly labels are not decisive. Harry A.

Koch Co., 23 BTA 161. We do not forget that taxation is a practical matter and this case requires the application of the general principle that substance and not form is controlling in the determination of the tax consequences flowing from business transactions between sophisticated businessmen. Commissioner of Internal Revenue v. Court Holding Co., 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 (1944); J. Strickland & Co. v. United States, 352 F.2d 1016 (6th Cir. 1965).

The Court must look, therefore, to just what it was that plaintiff received, regardless of the form of payment agreed upon by the parties.

■ The question is whether plaintiff made an expenditure which could be classified as an ordinary and necessary business expense within the meaning of Section 162 of the Internal Revenue Code of 1954, 26 U.S.C.A. (1958) § 162. The answer is clearly no.

Not all expenditures helpful to a business are ordinary and necessary or an expense. Some come closer to being a capital outlay than an ordinary expense. Such is the case here.

GOOD WILL

Cornillie argues that no sale or transfer of any business asset of any kind was made and that good will as an intangible asset cannot pass without being attached to some tangible asset such as contracts, trade name, etc. Numberless tax cases have held, however, that it is irrelevant just what property, if any, is transferred along with "good will." See, e. g. Falstaff Beer, Inc. v. Comm. of Internal Revenue, 322 F.2d 744 (5th Cir. 1963); Hillside Dairy Co. v. Comm., PH T.C., par. 44,055 (1944). And, as defendant points out, the Michigan cases which plaintiff cites are concerned with situations in which the purported owner of the good will has no further connection with the business in which the good will had been generated and to which it had attached. This is not a similar situation. These cases did not hold that a going business, with going relationships, such as Gulf, does not possess good will

which it can transfer. In Grand Rapids Trust Co. v. Haney School Furniture Co., 221 Mich. 487, 191 N.W. 196, 27 A.L.R. 1020 (1922), the court stated:

"We recognize the value of good will to a going business, and its value as an asset in case of sale of such a business, but we cannot extend the holdings with reference to such a recognized value to a business terminated by operation of law." Id. at 492, 191 N.W. at 197.

It is clear, however, that the good will which passed here was accompanied by an asset, the customer lists. Although the contract avoids the use of words of purchase, it is clear that the customer lists were, indeed, "purchased" by Cornillie from Gulf. No matter what the parties chose to call the arrangement, Cornillie got all of the essential rights of ownership. The understanding of the parties is clear and indicates that Gulf would give up all rights of ownership to the customer lists as a practical matter, but that for various reasons, this fact would not be acknowledged in the contract itself. In order to reach any other conclusion, the Court would have to ignore just what it was that Cornillie received. Cornillie received in actuality and as revealed by the conduct of the parties, the sum total of rights in the customer lists. The empty gesture of returning the paper lists while entertaining no intention of ceasing to service the customers on this list can be significant only if the Court could accept the premise that what is purchased in the sale of "customer lists" is the physical paper, the list itself. Perhaps the list itself was not "sold" to Cornillie, but there is little doubt that the relationships with the customers named on that list were transferred. It should be noted that the "return" of that list to Gulf did not stop Cornillie from servicing the accounts.

One of the most often quoted definitions of "good will" is as follows:

"Good will may be properly enough described to be the advantage or benefit, which is acquired by an establishment, beyond the mere value of the capital, stock, funds, or property employed

therein, in consequence of the general public patronage and encouragement, which it receives from constant or habitual customers, on account of its local position, or common celebrity, or reputation for skill, or affluence, or punctuality, or from other accidental circumstances or necessities, or even from ancient partialities or prejudices." [9]

In Los Angeles Towel Service v. Commissioner, PM Memo T.C. Par. 49,228 (1949), the petitioner, like the taxpayer here, paid for good will by commissions on sales. The court stated:

"Whether we treat the amounts allocated to commissions as the cost of good will, customer lists, going concern value or a combination of all three, the fact remains that petitioner paid the amounts claimed as "commissions" in order to acquire a part or all of the business and assets of competing firms. We hold that the "commissions" were capital expenditures, as determined by the respondent, and not deductible business expenses."

It is apparent that the transfer of this intangible asset is just what was being attempted by Gulf in its letters to the various customers in which it praised the new distributors and endeavored to transfer the loyalty which the customers had shown in Gulf over the years to the new distributor.

It is also obvious that what was transferred despite the characterization by the parties was the business relationship with each customer which Gulf had built up through the years. While it is true beyond question that great weight will be given to the characterization of a legal transaction appended by the parties to that transaction, this is not the case when the facts clearly show that the actual transaction is something other than what it is represented to be by one of the parties to it. If we accept the plaintiff's word "commissions", we must still characterize the contract as resulting in the transfer of the customer lists involved with the good will that accompanies such lists. According to Mr. Jann of Gulf, the Cornillie contract and the contracts with the others constituted essentially the "same deal". We agree.

We hold, therefore, that regardless of the terms employed and the method used, Cornillie was paying for Gulf's good will in a certain market built up over many years. Its payments were consequently not deductible from gross income. Hillside Dairy Co. v. Comm., PH Memo T.C. par. 44,055 (1944); Los Angeles Towel Service Co. v. Comm., PH Memo T.C. par. 49,228 (1949); Falstaff Beer, Inc. v. Comm. of Internal Revenue, 322 F.2d 744 (5th Cir. 1963); White v. Comm., PH Memo T. C. par. 63,017 (1963).

Nor can such payments be amortized over the life of the contract, as good will is non-depreciable. Treas.Reg. § 1.167 (a)–3; Anchor Cleaning Service, Inc. v. Comm. of Internal Revenue, 22 T.C. 1029, despite the fact that competition and other factors in the market may be causing a loss of customers.

The Court finds as a matter of fact and law that plaintiff's payments for "commissions" were in fact payments for good will which are not deductible as an ordinary and necessary business expense and are not depreciable under the applicable provisions of the Internal Revenue Code.

## CONCLUSION

On all issues before the Court, we find in favor of the defendant that the plaintiff has not proven that it overpaid to the defendant its taxes for the years involved.

A judgment shall be entered dismissing plaintiff's complaint.

9. 2 Story, Partnerships § 99 (6th ed. 1968).